FILED

2014 JUN 26  PM 1: 30

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2013 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>             v.<br><br>Q.T FASHION, INC.,<br>    dba "Q.T Maternity,"<br>    dba "Andres Fashion,"<br>JONG HACK PARK,<br>    aka "Andrew Park,"<br>    aka "Andres,"<br>SANG JUN PARK,<br>JOSE ISABEL GOMEZ ARREOLA,<br>    aka "Chabelo,"<br>MARIA FERRE S.A. de C.V.,<br>LUIS IGNACIO MUNOZ OROZCO,<br>    aka "Nacho,"<br>ARMANDO ARTURO CHAVEZ GAMBOA,<br>    and<br>DAISY ESTRADA CORRALES,<br><br>             Defendants. | CR No. 14- **CR 14 00372**<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy to Launder Money; 18 U.S.C. § 371: Conspiracy to Operate an Unlicensed Money Transmitting Business and to Smuggle Goods from the United States; 18 U.S.C. §§ 1960(a), (b)(1)(A), (b)(1)(B): Operating an Unlicensed Money Transmitting Business; 18 U.S.C. § 982: Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

1.     Defendant Q.T FASHION, INC., doing business as ("dba") "Q.T Maternity," dba "Andres Fashion" ("Q.T FASHION"), is a wholesale business located on 12th Street within the "Fashion District," in Los

Angeles, California, that sells clothes to U.S. and Mexican businesses.

2. Defendant JONG HACK PARK, also known as ("aka") "Andrew Park," aka "Andres" ("JONG PARK"), is the owner of defendant Q.T FASHION.

3. Defendant SANG JUN PARK ("SANG PARK") is the business manager of defendant Q.T FASHION.

4. Unindicted co-conspirator J.A. ("unindicted co-conspirator J.A.") is a salesperson at defendant Q.T FASHION, who reported to defendants JONG PARK and SANG PARK.

5. Defendant MARIA FERRE S.A. de C.V. ("MARIA FERRE") is a retail business located in Culiacán, Sinaloa, Mexico, that sells clothes imported from businesses in Los Angeles, California, including but not limited to defendant Q.T FASHION and Businesses #1-#25.

6. Defendant LUIS IGNACIO MUNOZ OROZCO, aka "Nacho," is the owner of defendant MARIA FERRE.

7. Defendant ARMANDO ARTURO CHAVEZ GAMBOA is the accountant for defendant MARIA FERRE.

8. Defendant DAISY ESTRADA CORRALES worked for defendant MARIA FERRE and advised defendants Q.T FASHION, JONG PARK, and SANG PARK, and unindicted co-conspirator J.A., when U.S. dollars would be delivered to defendant Q.T FASHION's business premises and how the dollars should be distributed to defendant Q.T FASHION, other stores in the Los Angeles Fashion District, and defendant JOSE ISABEL GOMEZ ARREOLA, aka "Chabelo" ("ARREOLA").

9.   Defendant ARREOLA was hired by defendant MARIA FERRE to change the labels on clothing merchandise sold by defendant Q.T FASHION to reflect country of origin as the United States of America rather than China, in order for defendant MARIA FERRE to obtain the benefit of preferential tariffs by the Mexican government under the North American Free Trade Agreement ("NAFTA").

10.  NAFTA is a treaty between United States, Mexico, and Canada that is generally aimed at expanding the flow of goods, services, and investment among these three countries.  NAFTA is codified in Title 19, United States Code, Section 3314, and the regulations promulgated thereunder, namely, 19 C.F.R. § 181.11, require that an exporter in the United States, such as defendant Q.T FASHION, must complete a Certificate of Origin form in the United States certifying that a good being exported from the United States into Mexico qualifies as an originating good for purposes of preferential tariff treatment under NAFTA.

11.  Victim A ("Victim A") was a United States citizen and drug distributor for the Sinaloa drug trafficking organization (the "Sinaloa Cartel"), who was held hostage at a ranch in Culiacán, Sinaloa, Mexico, by several members of the Sinaloa Cartel, including, but not limited to, unindicted co-conspirators A.F., aka "El Ruso" ("unindicted co-conspirator A.F.") and A.O., aka "Polo" ("unindicted co-conspirator A.O.").

12.  Victim B ("Victim B") and Victim C ("Victim C") were family members of Victim A, who received ransom demands from members of the Sinaloa Cartel regarding the release of Victim A.

13. On or about September 13, 2012, law enforcement seized over 100 kilograms of cocaine for which Victims A, B, and C were responsible for distributing in the United States, thereby creating a debt owed to the Sinaloa Cartel.

14. Members of the Sinaloa Cartel, including unindicted co-conspirator A.F., used businesses in the Los Angeles Fashion District, including defendant Q.T FASHION, to launder illicit proceeds, including but not limited to, ransom money and drug trafficking proceeds.

15. At all times relevant to the allegations in this Indictment, defendant Q.T FASHION was not registered or otherwise licensed as a money transmitting business either with the State of California or the U.S. Department of Treasury Financial Crimes Enforcement Network and was not exempt from licensing.

16. The money laundering method known as the Black Market Peso Exchange ("BMPE"), also known as Trade Based Money Laundering, was utilized by the Sinaloa Cartel in this case, and is often utilized by drug trafficking organizations ("DTOs") in Mexico to obtain Mexican pesos in exchange for their narcotics proceeds in U.S. dollars.

17. Mexican DTOs use the BMPE scheme to avoid Mexican anti-money laundering regulations announced in June 2010 that restrict the amounts of physical cash denominated in U.S. dollars that Mexican banks may receive.

18. By using this scheme (which involves U.S.-based business participants, such as defendant Q.T FASHION), the DTOs are able to collect their proceeds in Mexico without having to take the risk of smuggling U.S. currency across the Mexican border and without having

1  to convert and wire the U.S. currency through established financial

2  institutions, which not only carries transaction fees but also a risk

3  of detection.

4      19.  Generally, the BMPE scheme begins with a Mexican DTO

5  smuggling drugs into the United States and selling the drugs to a

6  U.S. DTO, which provides U.S. dollars as payment.  The Mexican DTO

7  will then work with a peso broker in Mexico to obtain Mexican pesos

8  in Mexico for the U.S. dollars in the United States, thereby avoiding

9  the risk of loss and detection.

10     20.  The peso broker will also work with a Mexican

11 wholesale/retail business that wants to order goods from an

12 importation/wholesale business in the United States who wants payment

13 in U.S. dollars.

14     21.  The peso broker or the DTO will arrange for the U.S.

15 dollars to be delivered to the U.S. importation/wholesale business to

16 pay for the goods purchased by the Mexican wholesaler/retailer.

17 Often, a courier working for the peso broker, or a courier working

18 directly with the Mexican DTO, delivers the U.S. dollars to the U.S.

19 importation/wholesale business "on behalf of" the Mexican

20 wholesaler/retailer business.

21     22.  After the U.S. dollars are delivered to the U.S.

22 importation/wholesale business for the goods to be shipped to Mexico,

23 the Mexican wholesale/retailer business pays the peso broker in

24 Mexican pesos for the value of the goods purchased in U.S. dollars

25 arranged by the peso broker.  The peso broker then provides the

26 Mexican pesos to the Mexican DTO.

27

28

COUNT ONE

[18 U.S.C. § 1956(h)]

The Grand Jury re-alleges and incorporates by reference as if fully stated herein paragraphs 1 through 22 of the Introductory Allegations.

A.   OBJECTS OF THE CONSPIRACY

Beginning on an unknown date and continuing until on or about September 18, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants Q.T FASHION, INC., doing business as ("dba") "Q.T Maternity," dba "Andres Fashion" ("Q.T FASHION"), JONG HACK PARK, also known as ("aka") "Andrew Park," aka "Andres" ("JONG PARK"), SANG JUN PARK ("SANG PARK"), JOSE ISABEL GOMEZ ARREOLA, aka "Chabelo" ("ARREOLA"), MARIA FERRE S.A. de C.V. ("MARIA FERRE"), LUIS IGNACIO MUNOZ OROZCO, aka "Nacho" ("MUNOZ"), ARMANDO ARTURO CHAVEZ GAMBOA ("CHAVEZ GAMBOA"), and DAISY ESTRADA CORRALES ("ESTRADA"), unindicted co-conspirators A.F., aka "El Ruso" ("unindicted co-conspirator A.F."), and A.O., aka "Polo," ("unindicted co-conspirator A.O."), J.A. ("unindicted co-conspirator J.A."), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit offenses against the United States, namely:

1.   Knowing that property involved in financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of a specified unlawful activity, that is, hostage taking, in violation of Title 18, United States Code, Section 1203(a), and drug trafficking conspiracy, in violation

of Title 21, United States Code, Section 846, conducted and attempted to conduct financial transactions:

> a.   With the intent to promote the carrying on of specified unlawful activity (hostage taking and drug trafficking conspiracy), in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

> b.   Knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and control of the proceeds of said specified unlawful activity (hostage taking and drug trafficking conspiracy), in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

B.   <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED</u>

The objects of the conspiracy were to be accomplished in substance as follows:

1.   The Sinaloa Cartel would generate large quantities of cash through the sale of cocaine and the collection of ransom money in the United States.

2.   The Sinaloa Cartel would order the kidnapping of Sinaloa Cartel members and associates, including Victim A, who owed drug-related debts to the Sinaloa Cartel.

3.   The Sinaloa Cartel, including unindicted co-conspirator A.F., would maintain a ranch in Culiacán, Sinaloa, Mexico, where they would hold those who owed drug-related debts to the Sinaloa Cartel, including Victim A, unless and until ransoms were paid (hereinafter, "A.F.'s Ranch").

1    4.   The Sinaloa Cartel, including unindicted co-conspirator
2 A.F., would seek repayment of drug debts from the debtors' friends
3 and family members, including Victim A's family members, Victim B and
4 Victim C.

5    5.   The Sinaloa Cartel would direct ransom payments to be made
6 to retail businesses in the United States, such as defendant Q.T
7 FASHION.

8    6.   The Sinaloa Cartel, including unindicted co-conspirator
9 A.F., would utilize the Black Market Peso Exchange scheme to launder
10 drug proceeds and ransom money through defendants Q.T FASHION, MARIA
11 FERRE and other retail businesses.

12    7.   As part of the Black Market Peso Exchange scheme, defendant
13 MARIA FERRE would purchase goods from defendant Q.T FASHION and other
14 businesses.

15    8.   Defendants MARIA FERRE, MUNOZ, CHAVEZ GAMBOA, ESTRADA, Q.T
16 FASHION, JONG PARK, SANG PARK, unindicted co-conspirator J.A., and
17 others would coordinate the delivery of bulk cash to Q.T FASHION by
18 unknown individuals and the distribution of that cash to different
19 businesses in the Los Angeles Fashion District, including Q.T
20 FASHION, and Businesses #1-#25, as well as to defendant ARREOLA.

21    9.   Defendant SANG PARK would count the bulk cash delivered at
22 defendant Q.T FASHION by unidentified individuals.

23    10.  Defendant ARREOLA would pick up remaining cash delivered to
24 defendant Q.T FASHION on behalf of defendant MARIA FERRE for further
25 distribution to other businesses or as payment for defendant
26 ARREOLA's services of changing the clothing labels on merchandise
27 purchased by defendant MARIA FERRE from defendant Q.T FASHION and

28

other businesses to reflect that the merchandise originated from the United States of America, rather than China, in order for defendant MARIA FERRE to obtain preferential tariff treatment under NAFTA.

11.   Unindicted co-conspirator J.A. would send e-mails in Spanish to defendant MARIA FERRE as directed by defendants JONG PARK and SANG PARK.  Unindicted co-conspirator J.A. would also provide directions to money couriers delivering bulk cash to defendant Q.T FASHION.

C.   OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on or about the following dates, defendants Q.T FASHION, JONG PARK, SANG PARK, ARREOLA, MARIA FERRE, MUNOZ, CHAVEZ GAMBOA, ESTRADA, and unindicted co-conspirators A.F., A.O., and J.A., and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

**LAUNDERING OF RANSOM MONEY**

1.   In October 2012, the Sinaloa Cartel ordered the kidnapping of Victim A for the loss of over 100 kilograms of cocaine, which Victim A was responsible for distributing in the United States with the assistance of Victims B and C.

2.   Beginning in October 2012, for a period of several weeks, the Sinaloa Cartel, including unindicted co-conspirator A.F., held Victim A hostage at A.F.'s ranch in Culiacán, Sinaloa, Mexico.

3.   Beginning in October 2012, while Victim A was held hostage, unindicted co-conspirator A.F. and others beat, shot, electrocuted, and water boarded Victim A, among other acts.

4.   Beginning in October 2012, while Victim A was held hostage, unindicted co-conspirator A.F. and others sent to Victims B and C ransom demands, as well as photographs of Victim A proving that Victim A was still alive.

5.   Beginning in October 2012, while Victim A was held hostage, unindicted co-conspirator A.F. told Victim A that unindicted co-conspirator A.F. used defendant Q.T FASHION in Los Angeles to launder drug proceeds and to import goods from China into Mexico.

6.   On December 14, 2012, Victim B received a communication directing Victim B to deliver $100,000 U.S. dollars to defendant Q.T FASHION located on East 12th Street in Los Angeles, California, and providing a telephone number associated with defendant Q.T FASHION.

7.   On December 14, 2012, Victim C called the telephone number provided in the communication directing payment to be delivered to defendant Q.T FASHION to ask for directions.

8.   On December 14, 2012, over the telephone, unindicted co-conspirator J.A. provided directions to defendant Q.T FASHION to Victim C.

9.   On December 14, 2012, Victims B and C delivered $100,000 U.S. dollars to defendants Q.T FASHION, SANG PARK, and unindicted co-conspirator J.A.

10.   On December 14, 2012, defendant SANG PARK and unindicted co-conspirator J.A. took Victim C into a back room located at defendant Q.T FASHION where defendant SANG PARK counted the cash.

11.   On December 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that defendant Q.T FASHION should

distribute the $100,000 U.S. dollars received that morning on behalf of defendant MARIA FERRE as follows:

| Business Name | Invoice | Date of Invoice | Amount of Cash To Be Remitted |
| --- | --- | --- | --- |
| Defendant QT FASHION | 36634 | 10/25/2012 | $3,022.50 |
| Defendant QT FASHION | 36638 | 10/26/2012 | $4,836.00 |
| Business #1 | 43690 | 10/26/2012 | $3,783.50 |
| Business #2 | 3291 | [intentionally left blank] | $7,260.00 |
| Business #3 | 23504 | 11/28/2012 | $3,633.00 |
| Business #4 | 2012-2879 | 9/27/2012 | $5,847.00 |
| Business #4 | 2012-2950 | 10/04/2012 | $6,399.00 |
| Business #5 | 21331 | 9/10/2012 | $2,106.00 |
| Business #5 | 21330 | 9/10/2012 | $1,944.00 |
| Business #5 | 22661 | 9/13/2012 | $1,080.00 |
| Business #5 | 22669 | 9/14/2012 | $1,620.00 |
| Business #5 | 22679 | 9/17/2012 | $1,782.00 |
| Business #24 | 27045 | 8/30/2012 | $2,052.00 |
| Business #24 | 27424 | 10/02/2012 | $798.00 |
| Business #6 | 46622 | 10/03/2012 | $8,256.00 |
| Business #7 | 72640 | 10/08/2012 | $5,000.00 |
| Business #8 | 5226 | 08/31/2012 | $609.00 |
| Business #8 | 5247 | 09/13/2012 | $3,600.00 |
| Business #8 | 5257 | 09/20/2012 | $2,268.00 |
| Business #9 | 603808 | 10/05/2012 | $8,410.50 |
| Business #9 | 611060 | 10/25/2012 | $2,262.50 |
| Business #9 | 624298 | 11/30/2012 | $318.50 |
| Business #10 | 19054 | 09/20/2012 | $2,727.00 |

| Business #10 | 19147 | 10/03/2012 | $7,000.00 |
| Business #11 | 81062 | 08/29/2012 | $8,708.00 |
| Business #11 | 81375 | 09/13/2012 | $3,399.00 |
| Business #12 | [intentionally left blank] | 09/05/2012 | $1,278.00 |

12.   On December 14, 2012, Victim B received a communication directing Victim B to deliver an additional $40,000 U.S. dollars to defendant Q.T FASHION.

13.   On December 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that another $40,000 U.S. dollars would be delivered and asking about the status of the payments and whether defendant ESTRADA could send another person to pick up cash from defendant Q.T FASHION.

14.   On December 14, 2012, Victims B and C returned to defendant Q.T FASHION and delivered $40,000 U.S. dollars to defendants Q.T FASHION and SANG PARK, and unindicted co-conspirator J.A.

15.   On December 14, 2012, defendant SANG PARK and unindicted co-conspirator J.A. took Victim C into a back room located at defendant Q.T FASHION where defendant SANG PARK counted the cash.

16.   On December 14, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that "they" had just brought the money, to wait, and to not send anyone.

17.   On December 14, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail asking whether defendant ESTRADA could give the businesses different times to pick up the money because defendant Q.T FASHION was very busy.

18.   On December 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail agreeing to give businesses different times to pick up the money.

19.   On December 14, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail confirming that an additional $40,000 U.S. dollars had been received and was ready to be picked up.

20.   On December 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail advising that a portion of this money could be used to pay defendant Q.T FASHION.

21.   On December 14, 2012, defendant ESTRADA instructed defendant Q.T FASHION to distribute the $40,000 U.S. dollars received that afternoon on behalf of defendant MARIA FERRE as follows:

| Business Name | Invoice | Date of Invoice | Amount of Cash To Be Remitted |
|---|---|---|---|
| Defendant Q.T FASHION | 36649 | 11/01/12 | $885.00 |
| Defendant Q.T FASHION | 36521 | 11/16/12 | $3,508.50 |
| Defendant ARREOLA | | | $10,000.00 |
| Business #5 | 21451 | 09/19/12 | $2,889.00 |
| Business #24 | 27500 | 10/09/12 | $1,863.00 |
| Business #11 | 81833 | 10/03/12 | $8,737.50 |
| Business #20 | 137045 | 10/04/12 | $7,858.00 |
| Business #24 | 201077 | 11/20/12 | $4,233.00 |

22.   On December 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail instructing that defendant ARREOLA should be provided with $10,000 U.S. dollars from the $40,000 ransom payment that Q.T FASHION previously received.

23.   On December 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail instructing Q.T FASHION to provide Business #9 with $8,410.50, $2,262.50 and $318.50, which were proceeds from the initial $100,000 ransom payment.

13

24.   On December 14, 2012, at A.F.'s Ranch in Culiacán, Sinaloa, Mexico, unindicted co-conspirator A.F. told one of his soldiers that the ransom money was available for pick-up in Culiacán and sent that soldier to pick it up.

25.   On December 14, 2012, Victim A was released from A.F.'s Ranch in Culiacán, Sinaloa, Mexico.

26.   On December 14, 2012, defendants Q.T FASHION, JONG PARK, and SANG PARK, using the cash delivered by Victims B and C, paid Business #8 approximately $2,268 U.S. dollars for invoice number 5257 dated September 20, 2012 on behalf of defendant MARIA FERRE.

27.   On December 14, 2012, defendants Q.T FASHION, JONG PARK, and SANG PARK, using the cash delivered by Victims B and C, paid Business #11 approximately $3,399 U.S. dollars for invoice number 81375 dated September 13, 2012 on behalf of defendant MARIA FERRE.

28.   On December 17, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant Q.T FASHION paid the businesses as requested by defendant ESTRADA and that $282 U.S. dollars remain.

29.   On December 17, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that $256 U.S. dollars remained from the $100,000 that had been delivered on December 14, 2012, and that $30 U.S. dollars remained from the $40,000 that had been delivered later that day.

### LAUNDERING OF DRUG TRAFFICKING CONSPIRACY PROCEEDS

30.   On June 5, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant ARREOLA picked up $7,000 U.S. dollars.

31.   On June 13, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that defendant MARIA FERRE, located in Culiacán, Sinaloa, Mexico, was trying to buy dollars and that defendant Q.T FASHION knew that the U.S. dollar was currently expensive in Mexico at that point in time.

32.   On June 19, 2012, defendant Q.T FASHION sent defendant MARIA FERRE an e-mail stating that Q.T FASHION had received $65,000 U.S. dollars and had applied $14,832 U.S. dollars of this amount towards invoice number 39325, leaving a balance of $50,168 U.S. dollars.

33.   On June 19, 2012, an employee of defendant MARIA FERRE sent defendant Q.T FASHION an e-mail stating that defendant ARREOLA would pick up the remaining balance of $50,168 U.S. dollars from defendant Q.T FASHION.

34.   On July 10, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that $20,000 U.S. dollars had been delivered to defendant Q.T FASHION.

35.   On July 11, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that $15,000 U.S. dollars had been delivered to defendant Q.T FASHION.

36.   On July 16, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail asking whether defendant Q.T FASHION received $15,000 U.S. dollars that day.

37.   On July 16, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail confirming that defendant Q.T FASHION received $15,000 U.S. dollars that day.

38.   On July 16, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that defendant ARREOLA would pick up $15,000 U.S. dollars from defendant Q.T FASHION.

39.   On July 18, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that $10,000 U.S. dollars had just been delivered to defendant Q.T FASHION.

40.   On July 20, 2012, defendant Q.T FASHION sent defendant ESTRADA and defendant CHAVEZ GAMBOA an e-mail stating that defendant ARREOLA picked up $7,500 U.S. dollars from defendant Q.T FASHION and that $13,000 U.S. dollars remained.

41.   On July 20, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail acknowledging defendant ARREOLA's pick up of $7,500 U.S. dollars.

42.   On July 27, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant ARREOLA was at defendant Q.T FASHION and would be taking $5,000 U.S. dollars.

43.   On July 27, 2012, an employee of defendant MARIA FERRE sent defendant Q.T FASHION an e-mail stating that defendant ARREOLA would be picking up $5,000 U.S. dollars.

44.   On July 31, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that defendant Q.T FASHION would be receiving $90,000 U.S. dollars.

45.   On July 31, 2012, defendant Q.T FASHION sent defendant ESTRADA and defendant CHAVEZ GAMBOA an e-mail stating that $90,000 U.S. dollars had been delivered, and asking whether defendant Q.T FASHION could use $4,504 U.S. dollars of this amount to credit the pending balance of defendant MARIA FERRE.

16

46. On July 31, 2012, an employee of defendant MARIA FERRE sent defendant Q.T FASHION an e-mail confirming that defendant Q.T FASHION could collect the outstanding balance from the $90,000 U.S. dollars to satisfy the pending balance of defendant MARIA FERRE.

47. On August 2, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail asking whether defendant ARREOLA could pick up $17,100 U.S. dollars from defendant Q.T FASHION that day.

48. On August 2, 2012, an employee of defendant MARIA FERRE sent defendant Q.T FASHION an e-mail confirming that defendant ARREOLA could pick up $17,100 U.S. dollars from defendant Q.T FASHION.

49. On August 15, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant ARREOLA had taken all of the cash and that defendant Q.T FASHION did not have any more cash to distribute for defendant MARIA FERRE.

50. On August 24, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that someone from Business #11 would be stopping by defendant Q.T FASHION to pick up $12,384 U.S. dollars.

51. On August 24, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant Q.T FASHION made payments to Business #5, #11, and #13.

52. On August 24, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail asking whether defendant Q.T FASHION should pay Business #13 for two invoices totaling $13,224.25 U.S. dollars.

53. On August 24, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail confirming that defendant Q.T FASHION should pay

Business #13 a total of $13,224.25 U.S. dollars to satisfy those invoices.

54. On August 25, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail asking whether defendant Q.T FASHION should pay Business #14, and if so, how much.

55. On August 25, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail directing defendant Q.T FASHION to pay $6,795.50 U.S. dollars to Business #14.

56. On August 28, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail asking how much cash was left over from the last delivery.

57. On August 28, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that $6,299 U.S. dollars remained from the last bulk cash delivery.

58. On August 31, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that $10,000 U.S. dollars had been delivered to defendant Q.T FASHION.

59. On September 4, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant ARREOLA had picked up $10,000 U.S. dollars from defendant Q.T FASHION and that the only remaining balance was with Business #13.

60. On September 13, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant Q.T FASHION had received a delivery of $15,000 U.S. dollars, and asking whether defendant Q.T FASHION could use $13,710 U.S. dollars from this amount to satisfy a pending invoice.

61.   On September 13, 2012, an employee of defendant MARIA FERRE sent defendant Q.T FASHION an e-mail informing defendant Q.T FASHION that defendant MARIA FERRE would pay defendant Q.T FASHION next week.

62.   On September 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that someone from Business #15 would be arriving at defendant Q.T FASHION to pick up a payment of $2,080 U.S. dollars, and asking defendant Q.T FASHION whether it had paid Business #16 and Business #17.

63.   On September 14, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that defendant Q.T FASHION would pay Business #15, but that defendant ESTRADA must tell Business #16 and Business #17 to pick up their money.

64.   On September 14, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail asking defendant ESTRADA how much money Business #16 and Business #17 should be paid.

65.   On September 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that $6,912 U.S. dollars should be paid to Business #16 and $2,912 U.S. dollars should be paid to Business #17, but that these businesses should bring their invoices to defendant Q.T FASHION.

66.   On September 14, 2012, defendant Q.T FASHION sent defendant ESTRADA an e-mail stating that the invoice from Business #17 showed a balance of $9,832 and asking for further instructions regarding the amount Business #17 should be paid.

67.   On September 14, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail attaching the two invoices for Business #16 and Business #17, directing defendant Q.T FASHION to pay the amount set

1  forth on those invoices, and advising defendant Q.T FASHION that

2  defendant ARREOLA would inform defendant ESTRADA of mistakes.

3     68.   On September 20, 2012, defendant ESTRADA sent defendant Q.T

4  FASHION an e-mail asking whether there was any cash remaining from

5  the last delivery of bulk cash.

6     69.   On September 20, 2012, defendant Q.T FASHION sent defendant

7  ESTRADA an e-mail stating that $3,088 U.S. dollars remained.

8     70.   On September 21, 2012, defendant ESTRADA sent defendant Q.T

9  FASHION an e-mail stating that someone from Business #18 would pick

10 up a payment of $3,088 U.S. dollars.

11    71.   On September 28, 2012, defendant MUNOZ sent defendant JONG

12 PARK an e-mail stating that during the following months, defendant

13 MUNOZ would be in charge of all payments to defendant Q.T FASHION

14 until defendant MUNOZ was able to stabilize the payments and have

15 defendant MARIA FERRE once again in good standing with defendant Q.T

16 FASHION.

17    72.   On October 1, 2012, defendant ESTRADA sent defendant Q.T

18 FASHION an e-mail stating that "Pedro" from Business #19 would pick

19 up $16,904 from defendant Q.T FASHION.

20    73.   On October 1, 2012, defendant ESTRADA sent defendant SANG

21 PARK an e-mail asking whether "some guy" had delivered cash to

22 defendant Q.T FASHION.

23    74.   On October 1, 2012, defendant SANG PARK sent an e-mail to

24 defendant ESTRADA confirming that cash had been delivered to

25 defendant Q.T FASHION and that defendant CHAVEZ GAMBOA advised

26 defendant SANG PARK to take $10,000 U.S. dollars as payment for

27

28

outstanding invoices, thereby leaving $70,000 U.S. dollars for defendant ESTRADA.

75.   On October 1, 2012, defendant ESTRADA sent defendant SANG PARK an e-mail stating that the "lady" from Business #17 would be arriving at defendant Q.T FASHION to pick up cash, directing defendant SANG PARK to pay her $10,125 U.S. dollars, and advising that Business #20 also would be picking up money from defendant Q.T FASHION.

76.   On October 1, 2012, defendant CHAVEZ GAMBOA sent defendant ESTRADA an e-mail showing that defendant MARIA FERRE owed $79,225 U.S. dollars to 10 different businesses, including to defendant Q.T FASHION, Business #6, Business #9, Business #17, Business #18, Business #19, Business #20, and Business #24.

77.   On October 1, 2012, using coded language, defendant CHAVEZ GAMBOA sent defendant Q.T FASHION an e-mail asking whether "they delivered 80 T-shirts."

78.   On October 1, 2012, defendant CHAVEZ GAMBOA sent defendant Q.T FASHION an e-mail stating that "Pedro" would pick up a payment of $16,904 U.S. dollars for his invoice.

79.   On October 2, 2012, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that someone from Business #20 would collect $8,594 U.S. dollars from defendant Q.T FASHION.

80.   On October 18, 2012, defendant CHAVEZ GAMBOA sent defendant Q.T FASHION an e-mail stating that defendant MARIA FERRE was trying to get U.S. dollars but had not been able to do so that week.

1    81.   On November 6, 2012, defendant ESTRADA sent defendant Q.T

2  FASHION an e-mail advising that defendant Q.T FASHION would be

3  receiving money that day.

4    82.   On November 6, 2012, defendant Q.T FASHION sent defendant

5  ESTRADA an e-mail stating that defendant Q.T FASHION received $16,500

6  U.S. dollars that day and that after deducting the amount owed to

7  defendant Q.T FASHION, $10,260 U.S. dollars remained.

8    83.   On January 11, 2013, defendant ESTRADA sent defendant Q.T

9  FASHION an e-mail asking whether money had been delivered the

10  previous day.

11    84.   On January 11, 2013, defendant Q.T FASHION sent defendant

12  ESTRADA an e-mail stating that no money had been delivered the

13  previous day.

14    85.   On January 15, 2013, defendant ESTRADA sent defendant Q.T

15  FASHION an e-mail stating that "they finally delivered money to make

16  payments," which would be delivered to defendant Q.T FASHION that day

17  or the following day.

18    86.   On January 16, 2013, defendant Q.T FASHION sent defendant

19  ESTRADA an e-mail stating that it received $5,600 U.S. dollars and

20  asking whether more cash would be delivered.

21    87.   On January 16, 2013, defendant ESTRADA sent defendant Q.T

22  FASHION an e-mail stating that it should be receiving an additional

23  delivery of $80,000 U.S. dollars.

24    88.   On January 16, 2013, defendant Q.T FASHION sent defendant

25  ESTRADA an e-mail asking her to please tell the money couriers that

26  when they call Q.T FASHION, they should not mention that they are

27

28

1  going to bring money and they should only ask for the address of Q.T

2  FASHION.

3       89.  On April 5, 2013, using coded language, defendant CHAVEZ

4  GAMBOA sent defendant Q.T FASHION an e-mail asking whether unindicted

5  co-conspirator J.A. received "75 T-shirts."

6       90.  On April 5, 2013, defendant Q.T FASHION sent defendant

7  ESTRADA and defendant CHAVEZ GAMBOA an e-mail stating that $10,000

8  U.S. dollars had been delivered and asking whether invoices 37950 and

9  37955 could be paid from this money.

10      91.  On April 5, 2013, using coded language, defendant CHAVEZ

11 GAMBOA sent defendant Q.T FASHION an e-mail confirming that an

12 additional "15 T-shirts" had been delivered.

13      92.  On April 5, 2013, using coded language, defendant CHAVEZ

14 GAMBOA sent an e-mail instructing defendant Q.T FASHION to give

15 $10,000 U.S. dollars to defendant ESTRADA and that others would be

16 picking up "75 T-shirts" soon.

17      93.  On April 8, 2013, defendant ESTRADA sent defendant Q.T

18 FASHION an e-mail stating that the following businesses would pick up

19 cash from defendant Q.T FASHION that day or the following day:

| Business Name | Invoice | Date of Invoice | Amount of Cash To Be Remitted |
|---|---|---|---|
| Defendant QT FASHION | 37950 | 02/06/2013 | $1,870.50 |
| Business #5 | 25067 | 02/06/2013 | $2,224.50 |
| Business #5 | 25034 | 02/14/2013 | $816.00 |
| Business #5 | 23957 | 02/19/2013 | $5,568.00 |
| Business #6 | 47485 | 01/10/2013 | $1,032.00 |
| Business #6 | 48443 | 01/10/2013 | $837.00 |
| Business #6 | 48594 | 02/20/2013 | $2,749.25 |
| Business #6 | 48636 | 02/22/2013 | $6,195.00 |
| Business #7 | 1371 | 02/20/2013 | $5,832.00 |
| Business #9 | 644369 | 02/11/2013 | $4,819.50 |
| Business #11 | JP84531 | 02/07/2013 | $4,917.00 |
| Business #11 | JP84849 | 02/20/2013 | $3,486.00 |
| Business #12 | 72256 | 02/05/2013 | $4,392.00 |

| Business #14 | 30341 | 02/20/2013 | $1,716.00 |
| Business #21 | 45392 | 02/15/2013 | $4,872.00 |
| Business #21 | 45461 | 02/21/2013 | $2,880.00 |
| Business #23 | 10765 | 04/03/2013 | $6,322.00 |
| Business #25 | 10342 | 02/20/2013 | $4,728.00 |
| Business #25 | 10368 | 02/22/2013 | $1,920.00 |

94.   On April 8, 2013, defendant CHAVEZ GAMBOA sent an email to defendant ESTRADA stating that the exchange rate for the U.S. dollar to pesos is "12.10," and he does not want to pay more than "12."

95.   On May 13, 2013, defendant Q.T FASHION sent defendants ESTRADA and CHAVEZ GAMBOA an e-mail stating that $62,000 U.S. dollars had been delivered to defendant Q.T FASHION and that after taking $18,303 U.S. dollars owed to defendant Q.T FASHION, a balance of $43,697 U.S. dollars remained.

96.   On May 17, 2013, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that there would be pick-ups of $4,506 U.S. dollars by Business #14 and $6,277.50 U.S. dollars by Business #21.

97.   On May 17, 2013, defendant Q.T FASHION replied to defendant ESTRADA's May 17, 2013, e-mail confirming that the cash already had been distributed.

98.   On May 21, 2013, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that the payments should be made as follows: $8,924.75 U.S. dollars to Business #4; $10,000 U.S. dollars to Business #6; $6,662.25 U.S. dollars to Business #8; and $4,413 U.S. dollars to Business #11.

99.   On July 12, 2013, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that defendant MARIA FERRE would send $8,000 U.S. dollars for Business #11 and $5,302 U.S. dollars for Business #22.

100. On July 12, 2013, defendant Q.T FASHION sent defendant MARIA FERRE an e-mail confirming that the cash for Business #11 and #22 had been picked up.

101. On July 12, 2013, defendant ESTRADA sent defendant Q.T FASHION an e-mail stating that defendant Q.T FASHION would receive $25,000 U.S. dollars and that the persons delivering the payment would use a code word.

102. On July 12, 2013, defendant Q.T FASHION sent defendant ESTRADA and defendant CHAVEZ GAMBOA an e-mail confirming the receipt of $25,000 U.S. dollars, and noting that a balance of $13,302 U.S. dollars remained after it took out $11,698 U.S. dollars to satisfy an outstanding invoice.

103. On September 18, 2013, using coded language, defendant CHAVEZ GAMBOA sent defendant Q.T FASHION an e-mail asking whether "T-shirts" had been delivered to defendant Q.T FASHION and stating that if so, Q.T FASHION was to take some of the money and apply it to an invoice for which defendant MARIA FERRE owed money to defendant Q.T FASHION.

104. On September 18, 2013, defendant Q.T FASHION sent an e-mail to defendant CHAVEZ GAMBOA stating that it had received $49,980 U.S. dollars and had deducted $3,523 as payment on an invoice, which left a balance of $46,457 U.S. dollars.

COUNT TWO

[18 U.S.C. § 371]

The Grand Jury re-alleges and incorporates by reference as if fully stated herein paragraphs 1 through 22 of the Introductory Allegations.

A. OBJECTS OF THE CONSPIRACY

Beginning on an unknown date and continuing until on or about September 18, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants Q.T FASHION, INC., doing business as ("dba") "Q.T Maternity," dba "Andres Fashion" ("Q.T FASHION"), JONG HACK PARK, also known as ("aka") "Andrew Park," aka "Andres" ("JONG PARK"), SANG JUN PARK ("SANG PARK"), JOSE ISABEL GOMEZ ARREOLA, aka "Chabelo" ("ARREOLA"), MARIA FERRE S.A. de C.V. ("MARIA FERRE"), LUIS IGNACIO MUNOZ OROZCO, aka "Nacho" ("MUNOZ"), ARMANDO ARTURO CHAVEZ GAMBOA ("CHAVEZ GAMBOA"), DAISY ESTRADA CORRALES ("ESTRADA"), and unindicted co-conspirator J.A., and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses against the United States:

1.    Operating an unlicensed money transmitting business affecting interstate and foreign commerce, in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(A), and 1960(b)(1)(B); and

2.    Smuggling goods from the United States, in violation of Title 18, United States Code, Section 554.

//

//

B.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
    ACCOMPLISHED

    The objects of the conspiracy were carried out, and to be
carried out, in substance, as follows:

    1.  The Grand Jury re-alleges and incorporates by reference as
if fully stated herein paragraphs 1 through 11 of Count One, Section
B.

    12.  Defendant MARIA FERRE and defendant ESTRADA would seek from
defendant Q.T FASHION and other Los Angeles-based businesses blank
certificate of origin forms that defendant MARIA FERRE could use to
provide to the Mexican government that would falsify the origin of
merchandise that defendant MARIA FERRE would import into Mexico.

    13.  Defendants Q.T FASHION, JONG PARK, and SANG PARK would
maintain blank certificates of origin at the business premises of
defendant Q.T FASHION and would send blank certificates of origins as
requested by defendant MARIA FERRE.

C.  OVERT ACTS

    In furtherance of the conspiracy, and to accomplish the objects
of the conspiracy, on or about the following dates, defendants Q.T
FASHION, JONG PARK, SANG PARK, ARREOLA, MARIA FERRE, MUNOZ, CHAVEZ
GAMBOA, and ESTRADA, and unindicted co-conspirator J.A., and others
known and unknown to the Grand Jury, committed various overt acts
within the Central District of California, and elsewhere, including
but not limited to the following:

    1.  The Grand Jury re-alleges and incorporates by reference as
if fully stated herein Overt Acts 1 through 104 of Count One, Section
C.

105. On February 25, 2011, defendant ESTRADA sent defendant Q.T FASHION, Business #6, Business #8, Business #22, and others an e-mail requesting a blank invoice and a blank certificate of origin form.

106. On July 28, 2011, defendant ESTRADA sent defendant Q.T FASHION and others an e-mail requesting a blank invoice that defendant MARIA FERRE would use to falsify the description and quantities of goods that defendant MARIA FERRE was importing into Mexico.

107. On May 2, 2012, defendant ESTRADA sent defendant Q.T FASHION and others an e-mail requesting a blank invoice for that day's import of goods from the United States into Mexico.

108. On September 7, 2012, defendant ESTRADA sent defendant Q.T FASHION and another business an e-mail asking for a blank invoice for that day's importation.

109. On April 16, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA charges $0.50 to change the importer, remove the "Made in China" label, and remove a pocket.

110. On April 16, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA charges $0.55 to change the brand and importer.

111. On April 16, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA charges $0.75 to change the brand and importer, remove a pocket, and put on a hanger.

112. On April 16, 2013, defendant MARIA FERRE maintained records showing the origin of goods purchased from several businesses in Los Angeles, California, including but not limited to, Businesses #4, #8, #10, #11, #14, #18, #19, #21, and #22.

113. On April 19, 2013, defendant MARIA FERRE maintained records showing that it had paid $3,280 U.S. dollars to defendant ARREOLA as of the week of March 11-16, 2013, and $7,093.15 U.S. dollars to defendant ARREOLA as of the week of April 8, 2013.

114. On May 14, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA changed 666 labels for Business #19 on goods originating from China, at a cost of $0.75 per label, for a total of $499.50.

115. On May 14, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA changed 618 labels for Business #4 on goods originating from China, at a cost of $0.75 per label, for a total of $463.50.

116. On May 14, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA changed 456 labels for Business #22 on goods originating from China, at a cost of $0.75 per label, for a total of $342.

117. On May 14, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA changed 687 labels for Business #10 on goods originating from China, at a cost of $.70 per label, for a total of $480.90.

118. On May 14, 2013, defendant MARIA FERRE maintained records showing that defendant ARREOLA changed 162 labels for Business #14 on goods originating from China, at a cost of $.75 per label, for a total of $121.50.

119. On May 14, 2013, defendant MARIA FERRE maintained records showing that it had made a $2,586 cash payment to defendant ARREOLA for changing labels on goods originating in China.

COUNT THREE

[18 U.S.C. §§ 1960(a), 1960(b)(1)(A), 1960(b)(1)(B)]

Beginning on an unknown date and continuing until on or about September 18, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants Q.T FASHION, INC., doing business as ("dba") "Q.T Maternity," dba "Andres Fashion" ("Q.T FASHION"), JONG HACK PARK, also known as ("aka") "Andrew Park," aka "Andres" ("JONG PARK"), SANG JUN PARK ("SANG PARK"), JOSE ISABEL GOMEZ ARREOLA, aka "Chabelo" ("ARREOLA"), MARIA FERRE S.A. de C.V. ("MARIA FERRE"), LUIS IGNACIO MUNOZ OROZCO, aka "Nacho" ("MUNOZ"), ARMANDO ARTURO CHAVEZ GAMBOA ("CHAVEZ GAMBOA"), DAISY ESTRADA CORRALES ("ESTRADA"), and unindicted co-conspirator J.A., and others known and unknown to the Grand Jury, knowingly conducted, controlled, managed, supervised, directed, and owned an unlicensed money transmitting business affecting interstate and foreign commerce that (1) operated without an appropriate money transmitting license in a State, namely, California, where such operation is punishable as a misdemeanor or a felony under state law; and (2) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and the regulations thereunder.

FORFEITURE ALLEGATION

[18 U.S.C.   § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982, in the event of any defendant's conviction under Count One or Three of this Indictment.   Upon such conviction, each defendant so convicted shall forfeit to the United States any right, title, and interest in any property, real or personal, involved in such offense, or any property traceable to such property, including, but not limited to, at least $1,600,000 U.S. dollars.

2.   Pursuant to Title 18, United States Code, Section 982(b)(1) and Title 21, United States Code, Section 853(p), each defendant convicted under Count One or Three of this Indictment shall forfeit substitute property, up to the value of the total amount described in paragraph one, if, as the result of any act or omission of said defendant, said property, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been

//

//

1

2   commingled with other property that cannot be divided without

3   difficulty.

4

5                                          A TRUE BILL

6

7                                          /S/

8                                          Foreperson

9   ANDRÉ BIROTTE JR.
    United States Attorney
10
    Scott Garringer
11  Deputy Chief, Criminal Division FOR:

12  ROBERT E. DUGDALE
    Assistant United States Attorney
13  Chief, Criminal Division

14  KEVIN M. LALLY
    Assistant United States Attorney
15  Chief, Organized Crime Drug
    Enforcement Task Force
16
    ROB B. VILLEZA
17  Assistant United States Attorney
    Deputy Chief, Organized Crime
18  Drug Enforcement Task Force

19  ANGELA L. SCOTT
    Assistant United States Attorney
20  Organized Crime Drug Enforcement
    Task Force
21

22

23

24

25

26

27

28